IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TIERONE BANK, | ) | 4:08CV3156 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| HARTFORD CASUALTY | ) | |
| INSURANCE COMPANY and | ) | |
| HARTFORD ACCIDENT AND | ) | |
| INDEMNITY COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

On November 7, 2007, the plaintiff, TierOne Bank ("TierOne"), submitted a claim to the defendants, Hartford Casualty Insurance Company and Hartford Accident and Indemnity Company (collectively, "Hartford"), under a financial institution bond for losses incurred by TierOne after a mortgage servicing contractor failed to remit over $12 million in loan payments that it had collected. Hartford investigated the claim but had not taken a position on coverage as of July 18, 2008, when TierOne filed this action alleging breach of contract. Hartford answered the complaint on September 9, 2008, and (1) denied that TierOne had provided all the information necessary to confirm the fact and the amount of the loss claimed, (2) alleged that the bond was cancelled prior to the loss by reason TierOne's discovery of other dishonest or fraudulent acts by the mortgage servicing contractor, and (3) alleged that TierOne had failed to give timely notice of the loss.

However, on February 10, 2009, after conducting certain discovery, Hartford informed TierOne that it had completed its investigation and determined that the loss was covered. TierOne received payment of the bond limit of $7,500,000 from Hartford on February 19, 2009. Because the payment was not made in settlement of this action, it remains to be determined whether TierOne is entitled to prejudgment

interest under Neb. Rev. Stat. §§ 45-103.02(2) and 45-104. Cross-motions for summary judgment have been filed for the purpose of making this determination.[1]

Hartford contends that TierOne cannot maintain a separate cause of action for prejudgment interest after accepting payment on the bond claim, and, in any event, that prejudgment interest is not allowable because there was a reasonable controversy both as to Hartford's liability and as to the amount of TierOne's loss while the bond claim was being investigated. TierOne argues that Hartford's payment of the claim conclusively establishes that it was a liquidated debt, and therefore it is entitled to 12% prejudgment interest on the sum of $7,500,000 from November 7, 2007, until February 19, 2009. TierOne also maintains that attorney's fees are recoverable under Neb. Rev. Stat. § 44-359 if a favorable judgment is entered on its claim for prejudgment interest. Hartford has not addressed the question of attorney's fees.

For the reasons discussed below, the court finds: (1) TierOne's acceptance of payment under the bond does not prevent it from seeking to recover prejudgment interest for Hartford's alleged breach of contract; (2) pursuant to the terms of the bond, TierOne's cause of action accrued 60 days after submission of a sworn proof of loss with full particulars; (3) TierOne fulfilled its obligation to provide Hartford with full particulars of the $12 million loss on November 7, 2007; (4) the claim was liquidated even though Hartford may have had legitimate reasons for investigating TierOne's prior dealings with the mortgage servicing contract to determine whether the bond was cancelled or the notice of loss was untimely; and (5) it is premature to determine TierOne's entitlement to attorney's fees. Hartford's motion for summary judgment will be denied. TierOne's motion for summary judgment will be granted

---

[1] Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. *Chial v. Sprint/United Management Co.*, 569 F.3d 850, 853 (8th Cir. 2009). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

to the extent that TierOne shall be awarded 12% prejudgment interest on the sum of $7,500,000 from January 6, 2008, to February 19, 2009. TierOne will be directed to file a motion for attorney's fees pursuant to Federal Rule of Civil Procedure 54(d)(2) and Nebraska Civil Rule 54.3, and entry of judgment will be postponed pending a determination of such motion.

## *Statement of Facts*

Upon careful review of the parties' evidence (filings 66, 69, 82, 84, 88) and briefs (filings 65, 68, 81, 83, 87, 90), and also the final pretrial conference order (filing 92), the court finds that the following facts are not genuinely in dispute and will be treated as established in the action:

1.  This is a civil action of which this court has original jurisdiction under 28 U.S.C. § 1332(a)(1), in that it is between citizens of different States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. (Pretrial Order (filing 92) ¶ 4.)

2.  The plaintiff, TierOne Bank ("TierOne"), is a federal savings association, with its home office in Lincoln, Nebraska and is considered to be a citizen of the State of Nebraska for purposes of diversity jurisdiction under 12 U.S.C. § 1464(x). (Pretrial Order ¶ 2.)

3.  The defendants, Hartford Casualty Insurance Company and Hartford Accident and Indemnity Company (collectively, "Hartford"), are incorporated under the laws of the State of Indiana and maintain their principal places of business in Hartford, Connecticut. (Pretrial Order ¶¶ 2, 3.)

4.  Hartford insured TierOne under Financial Institution Bond, Standard Form No. 24, Bond No. 91 FI 0231123FCC5426 (the "Bond"), which covered loss discovered by the insured during the bond period from May 1, 2006, to May 1, 2008.

The Bond provided coverage to TierOne for, among other things, a loss sustained as a result of the failure of a servicing contractor to pay money over to TierOne when due.  The Bond had a $7,500,000 limit for losses sustained as a result of a servicing contractor.  (Pretrial Order ¶¶ 5, 6; TierOne's Statement (filing 68) ¶¶ 5, 6; Hartford's Statement (filing 65) ¶¶ 5, 6, 7; TierOne's Response (filing 83) ¶ 5.)

> 5.  The Bond, as amended by Rider 197, includes coverage for:
>
> A1.   Loss, excluding loss resulting directly from Loans or trading, through any dishonest or fraudulent act committed by any Servicing Contractor, as hereinafter defined, acting alone or in collusion with others.
>
> Dishonest or fraudulent acts as used in this Insuring Agreement shall mean any dishonest or fraudulent acts committed by such Servicing Contractor with the manifest intent:
>
> (a) to cause the Insured to sustain such loss; or
>
> (b) to obtain financial benefit for the Servicing Contractor or for another person or entity.
>
> As used in this Insuring Agreement, financial benefit does not include any benefits earned in the normal course of employment, or performance of the servicing contract, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.
>
> * * *
>
> B.   Loss of Money (including obligations of the United States of America) collected or received for the insured by any such Servicing Contractor through the failure of such Servicing Contractor to pay to the Insured the money so collected or received as is discovered to be due and payable while this Insuring Agreement is in force, except, however, Money disbursed by such Servicing Contractor in accordance with instructions from the Insured.

4

(Pretrial Order ¶ 7; TierOne's Statement ¶ 7; Hartford's Response (filing 81) ¶ 7; Hartford's Statement ¶¶ 8; Hartford's Exhibit 202 (filing 66-8).)

6.   Section 2 of the Bond provides, in pertinent part:

This bond does not cover:

* * *

(s) potential income, including but not limited to interest and dividends, not realized by the Insured;

* * *

(v) indirect or consequential loss of any nature;. . . .

(Pretrial Order ¶ 63; Hartford's Exhibit 202.)

7.   At all times material to this action, TransLand Financial Services, Inc. ("TransLand"), located in Florida, was a servicing contractor for TierOne for purposes of the Bond because TransLand had been authorized by TierOne to "collect and record payments on real estate mortgage loans made, held or assigned to" TierOne.   (Pretrial Order ¶ 8; Complaint (filing 1) ¶ 6; Supplemental Answer (filing 61) ¶ 6.)

8.   In March 2003, TierOne entered into two contracts with TransLand . Under the first contract, as amended and restated, which was titled Commitment Agreement for the Sale and Purchase of Loans (the "Commitment Agreement"), TierOne agreed to acquire certain real estate construction mortgage loans (the "Loans") from TransLand.  Under the second agreement, as amended and restated, which was titled Agreement for the Servicing of Loans (the "Loan Servicing Agreement"), TransLand agreed to provide certain services relative to the Loans that TierOne acquired. (Pretrial Order ¶¶ 9, 10.)

9.   Under the Loan Servicing Agreement, TransLand was responsible for collecting and recording payments of principal, interest, and other sums on the Loans, which were made, held, or assigned to TierOne.  TransLand was required (among

other things) to report and remit to TierOne all principal, interest, and other payment collections received by TransLand in connection with the Loans, including prepayments and payoffs from refinancings.  (Pretrial Order ¶¶ 11, 12.)

      10.   The Loan Servicing Agreement provided:

         3.  Trust Standard.  Buyer and Servicer hereby acknowledge that unlike a typical purchase of participation interest, with subsequent servicing, buyer has acquired legal and equitable title to the Loans pursuant to the Commitment Agreement.  Nevertheless, Servicer at all times will act in a fiduciary capacity in favor of Buyer, it being the intent of the parties hereto that the standard of being trustee with fiduciary duties be imposed on the Servicer with respect to Servicer's duties and obligations in favor of the Buyer under this Agreement.

(Pretrial Order ¶ 13; Hartford's Exhibit 204 (filing 66-10).)

      11.   On August 2, 2007, TierOne and TransLand entered into an Agreement to Transfer Servicing, Release and Settlement Agreement, effective the same day, by which they agreed to terminate TransLand's servicing contractor relationship with TierOne.  Paragraph 4.q of the Agreement to Transfer Servicing, Release and Settlement Agreement recited:

      Servicer [TransLand] is a defendant in various lawsuits initiated by Loan debtors alleging fraud or acts of wrongdoing (which Servicer vehemently denies) and Servicer is the plaintiff in various foreclosure lawsuits where the Loan debtor, as defendant, has alleged defenses or counterclaims alleging fraud or acts of wrongdoing (which Servicer vehemently denies), and Servicer has received demands and threatened claims or litigation alleging fraud or acts of wrongdoing (which Servicer vehemently denies). . . .

(Pretrial Order ¶ 15; Hartford's Exhibit 222 (filing 66-28).)

12. On August 7, 2007, TierOne discovered that TransLand had received, but had not remitted to TierOne, payoffs for 60 loans (the "60 Loans") that TransLand was supposedly servicing for TierOne. Following its discovery, TierOne launched an investigation of TransLand. In the course of that investigation, TransLand's CEO, Roger Connor, admitted that TransLand had failed to remit to TierOne loan payoffs in excess of $12,000,000. TierOne also learned in the course of its investigation that TransLand had been maintaining two sets of financial records in an effort to conceal from TierOne the fact that the 60 Loans had been repaid by TierOne's borrowers. (Pretrial Order ¶ 16, 17, 18.)

13. TransLand provided false and misleading information to banks for which it acted as a servicing contractor when asked about loans and the status of payoff monies received in order to cover up the fact that it was not remitting payoff monies to various banks including TierOne. (Hartford's Statement ¶ 19.)

14. TierOne, along with others creditors of TransLand, filed a petition to put TransLand into involuntary bankruptcy. The United States Bankruptcy Court for the Middle District of Florida directed the trustee to appoint an examiner to investigate and report on TransLand. The bankruptcy examiner was appointed on September 5, 2007. (Pretrial Order ¶¶ 24, 25.)

15. The bankruptcy examiner issued his report on October 8, 2007. In his report, the bankruptcy examiner found that TransLand implemented a "Lapping Scheme" in which TransLand had used for its own benefit payoff funds that were due and payable to banks, including TierOne, for which it had serviced loans. The examiner also identified and found that TransLand had collected payoffs on the 60 Loans and that TransLand had failed to remit those payoffs to TierOne. (Pretrial Order ¶¶ 26, 27.)

7

16.  At a hearing in the bankruptcy case, Roger Connor, TransLand's CEO, admitted that TransLand had failed to remit to TierOne funds that TransLand had received from loan payoffs.  (Pretrial Order ¶ 28.)

17.  TierOne notified Hartford on August 10, 2007, by electronic mail, facsimile, and Federal Express, of TierOne's discovery that TransLand had collected, but had failed to remit, payoffs on the 60 Loans.  The notice stated that TierOne first became aware of facts indicating a possibility of loss on August 7, 2007, upon a review of computer records of mortgage amounts which disclosed a shortage of mortgage loan files TransLand was to be servicing for TierOne.  (Pretrial Order ¶ 19; (Hartford's Statement ¶ 37; TierOne's Response ¶ 37.)

18.  On August 17, 2007, Lana M. Glovach, who was handling the TierOne claim at the time for Hartford, sent a letter to one of TierOne's attorneys, Paul M. Schudel, Woods & Aitken, LLP, acknowledging receipt of notice of TierOne's claim and requesting that it provide the following initial information and documents (to the extent not already provided):

1.  A detailed narrative description of the loss, if there is additional information since your August 10th, 2007 letter.

2 . Date of discovery of the loss.

3.  A complete explanation of the circumstances and facts that led to the discovery of the loss reported, including the identity of those persons and documents involved in such discovery.

4.  A complete copy of the source documents used to determine the amount of the claim, including any accounting analysis.

5. A complete copy of each agreement, contract or like document by and between TierOne and TransLand related to TransLand's performance of services for TierOne.

8

(Pretrial Order ¶ 20; Hartford's Exhibit A-1 (filing 82-3).)

19.  On September 7, 2007, Ms. Glovach sent a letter Mr. Schudel, stating:

Hartford Fire Insurance Company ("Hartford") acknowledges receipt of, and thanks you for, your August 29th, 2007 letter and the 3-ring binder of accompanying documents.  Unless I overlooked it, I did not see our Proof of Loss form or any other sworn statement about the loss claimed; if I did overlook it, I apologize and would appreciate your directing me to it.  If TierOne did not provide a sworn Proof of Loss, please provide one as the Bond requires.  In the meantime, I will review the binder and be back in touch with you as soon as is reasonably possible.

(Pretrial Order ¶ 21; Hartford's Exhibit A-2 (filing 82-4).)

20.  On September 10, 2007, Ms. Glovach sent a letter to Mr. Schudel, stating:

I acknowledge that your letter and voice mail message indicate that the binder is not intended to be TierOne's Proof of Loss.  I intended simply to remind you that the Bond requires that TierOne provide a sworn proof of loss, with full particulars, within 6 months of discovery of loss as defined in the Bond.

As to your inquiry about a forensic audit, please be advised that the Bond does not require a forensic audit, although any insured is free to submit one in support of any claim made.  Whether an insured offers a forensic audit or its own internal documents, there will in all likelihood be follow up inquiries to examine the methodology used and the source documents examined in presenting a claim.  You, and not Hartford Fire Insurance Company ("Hartford"), are in the best position at this time to determine the manner in which to submit a claim, given our respective roles and responsibilities in this process.[1] As a result and because Hartford does not know the nature and scope of communications between TierOne and TransLand or the type of source documents at issue, Hartford cannot guide you as to the preferable method of presentation or assure you at this time that what has not yet been submitted will be sufficient to establish a covered claim.  As I am sure

9

you also appreciate, often in the claim verification process information presented leads to further inquiries and, as stated in my August 17th letter, Hartford naturally reserves the right to request additional information and documents in the event that TierOne submits a claim.

> [1] It is a fundamental principle that TierOne, as the insured, has the burden to establish the existence, cause and amount of a covered loss under the Bond. Hartford's duty is to verify and confirm – not establish – that the Bond covers the claim presented to us via the Proof of Loss and related submissions. Our claim verification process also addresses Bond conditions and exclusions.

(Pretrial Order ¶ 22; Hartford's Exhibit A-3 (filing 82-5).)

21.  On September 18, 2007, Ms. Glovach sent a letter to Mr. Schudel, stating:

I have now had an opportunity to review the binder you forwarded on August 29th, 2007.  You state that this binder is not and was not intended to be a sworn proof of claim but, rather, was informational, and supplemented the loss notice.  If you have other materials you believe would be useful and of interest to supplement that loss notice, please forward them to me.  While I appreciate receiving this information, please be reminded that once a sworn, documented proof of loss is filed, Hartford will have additional information and document requests. Hartford naturally reserves its right to request additional information and documents in the event that TierOne submits a claim via a sworn, documented proof of loss.

(Pretrial Order ¶ 23; Hartford's Exhibit A-4 (filing 82-6).)

22.  On November 7, 2007, TierOne filed its proof of loss with Hartford. TierOne's proof of loss included an affidavit that detailed TransLand's relationship with TierOne as a servicing contractor and TierOne's discovery that TransLand had failed to remit payoffs to TierOne in excess of $12 million.  (Pretrial Order ¶ 29.)

10

23.  In support of its claim, TierOne included in its proof of loss: (a) copies of its contracts with TransLand; (b) a spreadsheet maintained by TransLand showing that it had collected, but failed to remit, loan payoffs to TierOne; (c) reports filed with various state and federal agencies concerning TransLand's failure to remit loan payoffs; (d) the Bankruptcy Examiner's Report on TransLand; (e) a transcript of a hearing in the bankruptcy court containing an admission from TransLand's CEO that it had failed to remit loan payoffs; (f) notes documenting each of the 60 Loans; (g) mortgages securing notes on each of the 60 Loans; (h) the borrower's account history maintained by TransLand on each of the 60 Loans, which contained payoff entries for each loan; and (i) bank statements of TransLand's bank, which showed that TransLand had received loan payoffs.  (Pretrial Order ¶ 30.)

24.  The Bond allows Hartford to investigate a claim by requesting documents and taking examinations under oath.  Section 7 of the Conditions and Limitations of the Bond provides in part:

> (d) Upon the Underwriter's request and at reasonable times and places designated by the Underwriter the Insured shall
>
> > (1) submit to examination by the Underwriter and subscribe to the same under oath; and
> >
> > (2) produce for the Underwriter's examination all pertinent records; and
> >
> > (3) cooperate with the Underwriter in all matters pertaining to the loss.

(Pretrial Order ¶ 32; Hartford's Exhibit 202.)

25.  Hartford engaged the services of James A. Black, Jr. and Jeffrey M. Paskert of Mills Paskert Divers P.A., a Tampa, Florida law firm, to assist in the investigation of TierOne's claim.  Mr. Paskert sent a letter dated November 16, 2007,

to Mr. Reuter requesting a preliminary meeting with those persons most familiar with the Proof of Loss, the accompanying materials and the sum and substance of the claims and requesting that Mr. Reuter contact him to discuss convening this meeting as soon as possible.  TierOne honored the request by having Mr. Black and Mr. Paskert meet with TierOne's representatives, Sheryl Brown and Gale Furnas, in Lincoln, Nebraska, on December 22, 2007. (Pretrial Order ¶ 31; Hartford's Statement ¶¶ 25, 39, 40.)

26.   On January 7, 2008, Mr. Black sent an e-mail to one of TierOne's attorneys, Bartholomew F. Reuter, advising Mr. Reuter of the information he would like to review and the people with whom he wished to interview in connection with the investigation of TierOne's claim.  Among the documents Mr. Black told Mr. Reuter he wished to review were the following:

> C. Review all Audit committee minutes and reports relating to TransLand.
>
> D. Review all Internal and External Audit Reports relating directly or indirectly to TransLand or servicing contractors.

(Pretrial Order ¶ 33; Hartford's Statement ¶¶ 26, 27; Hartford's Exhibit D (filing 66-5).)

27.  TierOne produced documents responsive to Hartford's requests the very next week, beginning on January 13, 2008.  Mr. Black traveled to TierOne's offices and reviewed the documents on January 14-17, 2008.  TierOne had on site every one of the 3,393 loans serviced by TransLand,  and offered to allow Hartford to review any of those loan files during its visit.  TierOne advised Hartford that there were no internal or external audits, but in response to a subsequent request TierOne produced random quality control reviews of loan files by TierOne's internal audit department, some of which included loans originated by TransLand.  (Pretrial Order ¶¶ 33, 54;

TierOne's Statement ¶¶ 21, 22; Hartford's Statement ¶¶ 28, 29; TierOne's Response ¶ 28.)

28.   Among the documents TierOne produced in response to Mr. Black's requests for information and documentation were the following e-mails and correspondence between TierOne's employees and TransLand's employees:

a.  E-mail dated January 24, 2007, 7:42 PM, from Sheryl Brown, First Vice President of TierOne and Construction Operations and Servicing Manager, to Ingrid Fermin, Chief Finance Officer of TransLand, Subject: TransLand Overdisbursements (Hartford's Exhibit 205 (filing 66-11));

b.  E-mail dated January 25, 2007, 8:38 AM, from Ingrid Fermin to Sheryl Brown, Subject: TransLand Overdisbursements (Hartford's Exhibit. 206 (filing 66-12));

c.  E-mail dated January 25, 2007, 9:28 AM, from Ingrid Fermin to Sheryl Brown, Subject: TransLand Overdisbursements (Hartford's Exhibit 207 (filing 66-13));

d.  E-mail dated January 25, 2007, 10:03 AM, from David Hartman, Senior Vice President of TierOne and Director of Real Estate Lending, to Sheryl Brown and Ingrid Fermin, Subject: TransLand Overdisbursements (Hartford's Exhibit 208 (filing 66-14));

e. E-mail dated January 25, 2007, 11:49 AM, from Sheryl Brown to Ingrid Fermin, Subject: TransLand Overdisbursements (Hartford's Exhibit 209 (filing 66-15));

f.  E-mail dated January 26, 2007, 3:16 PM, from Bennie Wofford, Vice President of Accounting and Finance of TransLand, to Sheryl Brown, Subject: LIP Overdisbursements (Hartford's Exhibit 210 (filing 66-16));

g.  E-mail dated January 29, 2007, 12:50 PM, from Bennie Wofford to Sheryl Brown, Subject: LIP Over disbursement reconciliation (Hartford's Exhibit 211 (filing 66-17));

h.  E-mail dated January 29, 2007, 12:50 PM, from Bennie Wofford to Sheryl Brown, Subject: LIP Over disbursement reconciliation (Hartford's Exhibit 212 (filing 66-18));

i.  E-mail dated February 7, 2007, 2:47 PM, from Sheryl Brown to Bennie Wofford, Subject: LIP Over disbursement reconciliation (Hartford's Exhibit 213 (filing 66-19));

j. E-mail dated February 15, 2007, 10:32 AM, from Sheryl Brown to Bennie Wofford, Subject: LIP Over disbursement reconciliation (Hartford's Exhibit 214 (filing 66-20));

k.  E-mail dated February 21, 2007, 8:26 AM, from Bennie Wofford to Sheryl Brown, Subject: LIP Over disbursement reconciliation (Hartford's Exhibit 215 (filing 66-21));

l.  E-mail dated February 21, 2007, 8:37 AM, from Sheryl Brown to Bennie Wofford, Subject: LIP Over disbursement reconciliation (Hartford's Exhibit 216 (filing 66-22));

m.  E-mail dated February 21, 2007, 2:10 PM, from Bennie Wofford to Sheryl Brown, Subject: LIP reconciliation (Hartford's Exhibit 217 (filing 66-23));

n.  E-mail dated February 22, 2007, 9:55 AM, from Sheryl Brown to Bennie Wofford, Subject: LIP reconciliation (Hartford's Exhibit 218 (filing 66-24));

o.  Letter dated April 12, 2007, from Delmar Williams, Senior Vice President and Chief Credit Officer of TierOne, to TransLand, Attn: Roger W. Conner, III, President/CEO, Re: Amended and Restated Agreement for the Servicing of Loans made as of November 5, 2005, and First, Second and Third Amendments Thereto (collectively "Servicing Agreement") (Hartford's Exhibit 219 (filing 66-25)); and

p.  E-mail dated May 29, 2007, 8:54 AM from Delmar Williams to Gale Furnas, with attached e-mail from Michael Szwajkowski to Gales Furnas dated May 28, 2007, 11:59 AM concerning Capturing Servicing (Hartford's Exhibit 220 (filing 66-26)).  This e-mail showed that TierOne had been negotiating to

14

purchase for consideration the servicing rights under the loans that Transland had been servicing for it.

(Pretrial Order ¶ 34; Hartford's Statement ¶ 30; TierOne's Response ¶ 30.)

29.  Overdisbursements on loans serviced by TransLand occurred at a loan's closing.  To enable TransLand to disburse funds on its behalf in connection with construction loan closings handled by TransLand, TierOne, from time to time between March 2003 and early 2007, wired TransLand slightly more money than ultimately proved necessary for TransLand to disburse for the borrower.  These so-called "loan-in-process (LIP) overdisbursements" generally happened because TierOne wired funds for the loan closings based on a closing estimate, and the actual amount required at closing sometimes was less.  TransLand notified TierOne of the amount of the overdisbursement that it had retained on a loan by transmitting a HUD-1 form to TierOne after the loan closing; TierOne usually received the HUD-1 forms from TransLand within a week after a loan closing.  (Pretrial Order ¶¶ 44, 45.)

30.  Before early 2007, TierOne authorized and allowed TransLand to repay the amount of the overdisbursements (plus interest) to it at the first draw on the loan after the closing (or later).  By an e-mail sent on January 24, 2007, which was not motivated by any perception on TierOne's part of any dishonesty or fraud on TransLand's part, TierOne requested that TransLand pay the total of the then-outstanding overdisbursements.  The e-mail referred to "a recent audit" during which TierOne "discovered numerous loans TierOne Bank purchased from TransLand where the initial loan disbursement (check sent from TransLand to Closing) was more than the amount needed at settlement."  (Pretrial Order ¶¶ 14, 46; TierOne's Statement ¶¶ 36, 38; Hartford's Response ¶ 39; Hartford's Exhibit 205.)

31.  On January 24, 2007, TransLand owed TierOne $212,098.45 on account of overdisbursements.  TransLand repaid $72,593.67 of that amount on January 26, 2007, plus an additional $114,192.69 on January 29, 2007.  This left, as of the latter

date, an overdisbursement balance owing to TierOne of $25,312.09. (Pretrial Order ¶ 47.)

32. On April 12, 2007, TierOne sent a letter to TransLand (Hartford's Exhibit 219) notifying it that it still owed TierOne $25,312.89 for overdisbursements. TierOne declared the balance due 30 days thereafter, notifying TransLand that if the balance was not paid within 30 days, TierOne would declare TransLand in default of its servicing obligations under the parties' agreement. TransLand paid the balance five days later, on April 17, 2007. This failure to refund overdisbursements was not mentioned in the notice of claim that TierOne sent to Hartford on August 10, 2007. (Pretrial Order ¶ 48; Hartford's Statement ¶ 38.)

33. Section 3 of Rider 197 of the Bond provided that Hartford's servicing contractor coverage would be terminated under the following circumstances: "The attached bond shall be deemed canceled as to any Servicing Contractor: (a) immediately upon discovery by the Insured of any dishonest or fraudulent act on the part of such Servicing Contractor unless within five days after discovery of such act, the Insured shall give the Underwriter written notice thereof and in such event this bond shall be deemed canceled as to such Servicing Contractor at the expiration of thirty days after such discovery of such act; . . . ." (Pretrial Order ¶ 49; Hartford's Exhibit 202.)

34. Section 3 of the Conditions and Limitations of the Bond, as amended by Rider F11, provided:

> Section 3: This bond applies to loss discovered by Risk Management, General Counsel/Legal, Internal Audit, HR or Corporate Security during the Bond Period. Discovery occurs when Risk Management, General Counsel/Legal, Internal Audit, HR or Corporate Security first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss

16

occurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when Risk Management, General Counsel/Legal, Internal Audit, HR or Corporate Security receives notice of an actual or potential claim in which it is alleged that Risk Management, General Counsel/Legal, Internal Audit, HR or Corporate Security is liable to a third party under circumstances which, if true, would constitute a loss under this bond.

(Pretrial Order ¶ 50; Hartford's Exhibit 202.)

35.  Section 5 of the Conditions and Limitations of the Bond, as amended by Rider F11, provided:

Section 5:

(a) At the earliest practical moment, not to exceed one-hundred twenty (120) days, after discovery of loss, a Director, Officer, manager, supervisor or any other employee in a managerial position shall give the Underwriter notice thereof.

(b) Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars.

\* \* \*

(d) Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of 60 days after the original proof of loss is filed with the Underwriter or after the expiration of 24 months from the discovery of such loss.

(e) If any limitation embodied in this bond is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

(f) This bond affords coverage only in favor of the Insured. No suit, action or legal proceedings shall be brought hereunder by any one other than the named insured.

(Pretrial Order ¶ 64; Hartford's Exhibit 202.)

36. After Hartford raised the overdisbursement issue, TierOne investigated in late 2008, but found no evidence that any person in TierOne's Risk Management, Internal Audit, HR or Corporate Security departments was aware of the fact of the overdisbursements until after August 2007. TierOne does not have a General Counsel/Legal department. (Pretrial Order ¶ 51.)

37. On February 27 and 28, 2008, Hartford's attorney, James Black, conducted examinations under oath of all six TierOne employees whom Hartford had asked to examine: Delmar Williams, Tim Higgins, Sheryl Brown, David Hartman, Ronald Cheffer, and Gale Furnas. Mr. Black asked only one witness, Sheryl Brown, about the handling of overdisbursements on loans serviced by TransLand. Ms. Brown stated in her examination under oath that TransLand had worked out with a previous manager of TierOne that TransLand would give TierOne the LIP refund at the next draw. Ms. Brown also testified that she considered the overdisbursement problem "[j]ust typical housecleaning items to reconcile." (Pretrial Order ¶¶ 35, 52; TierOne's; Hartford's Statement ¶¶ 41, 45; Hartford's Exhibit 224 (filing 66-30), p. 31.)

38. In an e-mail dated March 4, 2008, from Mr. Black to Mr. Reuter, Hartford requested that TierOne provide additional documents, as had been agreed the previous week during the examinations under oath. The request stated in part:

2. TierOne Bank was to provide the calculation of the interest claimed on each of the loans claim [sic] on Exhibit 1. This calculation will show the period for which interest is claimed, the rate of interest and the amount of interest claimed for each period;

3. TierOne is to provide a record showing how much was collected by Transland at the payoff of each loan claimed and with a break out of the amounts which Transland should have remitted to TierOne Bank. We agreed that this amount would be calculated as of the day the funds were received by Transland.

Mr. Black also stated in the March 4th e-mail that "[w]e will likely need to request additional documents once we receive the signed statements." (Pretrial Order ¶ 36; TierOne's Statement ¶; Hartford's Statement ¶ 42; Hartford's Exhibit 223 (filing 66-29).)

39.   Mr. Black states that he did not receive the interest calculations or loan payoff information, but a letter Mr. Reuter sent to him on March 25, 2008, indicates that the requested documents were enclosed.  In the letter, Mr. Reuter also stated his position regarding Hartford's investigation and requested to receive any additional document requests from Hartford before April 1, 2008.   (Pretrial Order ¶ 37; Hartford's Statement ¶ 43; TierOne's Response ¶ 43; Hartford's Exhibit F (filing 66-7).)

40.   On March 31, 2008, Hartford attorneys Mr. Black and Mr. Paskert interviewed former TransLand employee Bennie Wofford, who emphatically denied that there was any agreement or understanding that TransLand could give TierOne the LIP refund at the next draw.[2]  (Hartford's Statement ¶ 47.)

---

[2] TierOne objects that Mr. Wofford's statement is inadmissible hearsay.  The objection is overruled with the understanding that the statement is not offered to prove the truth of the matter asserted, but only that Mr. Wofford contradicted Sheryl Brown's statement regarding the handling of overdisbursements.  TierOne further objects that Hartford failed to specifically identify Mr. Wofford's statement when asked to state the factual basis for its affirmative defenses, and that the evidence is irrelevant to the extent that "it goes to defendant's state of mind."  These additional objections are also overruled.

41.  Having heard nothing since sending his letter of March 25th, Mr. Reuter requested an update from Hartford on the status of its investigation during the week of May 12, 2008.  When Hartford did not respond, Mr. Reuter sent a follow-up e-mail to Mr. Paskert on May 20, 2008.  The e-mail again asked for a status update and also asked for copies of documents that Mr. Reuter had previously requested.  (TierOne's Statement ¶ 25;  Hartford's Response ¶ 25;  TierOne's Exhibit 25 (filing 69-6, p. 196).)

42.  On May 23, 2008, Hartford told TierOne's counsel that Hartford's "investigation continues to progress" but that, at the time, "Hartford does not have additional document or information requests."  Hartford did not request documents from TierOne between March 4, 2008, and May 23, 2008.  (Pretrial Order ¶ 38; TierOne's Exhibit 19 (filing 69-6, pp. 164-165).)

43.  On June 10, 2008, before the filing of this lawsuit, a Hartford claims representative internally requested (but did not disclose to TierOne) substantial authority from a co-worker to settle the case, before TierOne commenced litigation. The e-mail requesting this authority stated:

Tom,

Attached is a request for reserve and settlement authority of $5 million for the referenced fidelity claim.  As you will recall it is clear that the insured suffered Loss well in excess of the $7.5 million policy limit. However, our investigation has turned up facts which suggest that the Loss should have been discovered at an earlier date, before much of the ultimate loss was sustained.  We have sought the opinion of a banking expert who concurs that there were "red flags" that the insured did not act upon.  We expect the insured to counter by claiming that they could not have uncovered the Loss any earlier but we would like to negotiate a resolution of this matter at a meeting later in June.  We believe that a $5 million reserve represents a fair settlement value I [sic] light of the issues uncovered to date and the costs of proceeding with a coverage action.

John D. and I are available to discuss at your convenience.

Regards,
Chris

In the section captioned "Significant Coverage Issues", the Claim Status Report that accompanied the above e-mail states "N/A."   (Pretrial Order ¶ 39; TierOne's Exhibit 20 (filing 69-6, pp. 166-170).)

44.  In June 2008, Hartford invited TierOne to submit additional documentation to substantiate its claim.  On July 18, 2008, TierOne provided several documents in response to this invitation.  In an e-mail to Mr. Reuter on July 21, 2008, Mr. Paskert acknowledged receipt of these materials and stated:

> The Hartford previously had uncovered and seen most, if not all, of the materials.  I assume from the circumstances and your prior comments that The Hartford will not be receiving additional Proof of Loss materials from TierOne.  Please let me know immediately if my assumption is incorrect.  Otherwise, The Hartford is closing out its verification process, per my comments at our 6/23 meeting.

Mr. Reuter responded in an e-mail on July 25, 2008, stating:

> TierOne believes that it has supplied Hartford with all of the information that it needs to pay the claim.  Because Hartford has refused to make that payment, TierOne filed a complaint so that the Court can resolve the matter.

> At our meeting on June 23, you asked whether TierOne wanted to submit additional information.  I provided you with documentation that TierOne believed addressed Hartford's stated concern and you advise below that you already had most (if not all) of it.  In our July 9 telephone call, I asked you to let me know if Hartford had specific questions or document requests that it wanted to make. You indicated that you would consult with your client on that subject.  If Hartford believes that it needs additional information to process the claim, please provide me

with a specific request.  TierOne should not be put in the position of guessing what Hartford wants to see or know.

(Pretrial Order ¶ 40; TierOne's Statement ¶ 30; Hartford's Response ¶¶ 30, 31; TierOne's Exhibit 21 (filing 69-6, pp. 171-172).)

45. TierOne filed its complaint on July 18, 2008.  (Hartford's Statement ¶ 52.)

46.  Mills Paskert Divers, P.A., on behalf of Hartford, employed Reynolds Group, L.L.C., a consulting firm with experience in commercial and mortgage banking, including construction and warehouse lending, to assist in investigating TierOne's claim.[3]  Reynolds Group issued reports concerning the claim dated July 31, 2008, and August 15, 2008.[4]  The second report raised the following questions regarding TierOne's claim of loss relating to its relationship with TransLand:

a. TierOne did not give notice to Hartford after it became aware of facts which would cause a reasonable person to assume that a loss of the type covered by the bond had been or would be incurred.

b. TierOne should have reported to Hartford a notice of default in a relationship where the potential defaulting party was administering loans totaling over 10% of the Bank's assets equivalent to over 100% of the Bank's capital base.

---

[3] TierOne objects that there is no foundation for the statement that Reynolds Group, L.L.C., has experience in commercial and mortgage banking.  This objection is overruled.

[4] TierOne objects that the Reynolds Group reports are hearsay.  This objection is overruled with the understanding that the contents of the reports are not offered to prove the truth of the matter asserted.  TierOne also objects that the reports lack foundation and are irrelevant.  These objections are also overruled.  Finally, TierOne objects that no person from the Reynolds Group been qualified as an expert witnesses in this matter or disclosed as a nonexpert witness.  This objection is also overruled.

c. The overdisbursements should have been refunded to TierOne immediately based on Ms. Fermin's statement in her e-mail dated January 25, 2007, that "they are tracked in a separate account for the borrower" which would indicate that they were readily available and the fact that they were not immediately refunded would indicate to a reasonable person that TransLand was engaging in fraudulent and dishonest acts that would lead to a loss of the type covered by the bond.

d. TransLand would have needed to keep two sets of books to accommodate the procedure regarding the LIP overdisbursements and TierOne would have had to be aware of that fact.

e. If there was an informal arrangement allowing TransLand to defer payment of overdisbursements to TierOne Bank and instead pay interest on them, it would have constituted an unsecured loan to TransLand that would have been subject to much higher capital allocation requirements than a secured loan such as a residential construction loan and such an undocumented loan not reported to the regulators and/or outside auditors properly would violate Passage II in TierOne's Code of Conduct and Ethics.

(Hartford's Statement ¶¶ 49, 50.)

47.   Hartford answered TierOne's complaint on September 9, 2008, and asserted three affirmative allegations, all of which relate to TransLand's handling of overdisbursements:

22.  For further answer, Hartford Casualty Insurance Company and Hartford Accident and Indemnity Company state that the Financial Institution Bond provides in part:

3. The attached bond shall be canceled as to any Servicing Contractor; (a) immediately upon discovery by the Insured of any dishonest or fraudulent act on the part of such Servicing Contractor unless within five days after discovery of such act, the Insured shall give the Underwriter written notice thereof and in such event this

23

bond shall be deemed canceled as to such Servicing Contractor at the expiration of thirty days after such discovery of such act. . . .

23. Hartford Casualty Insurance Company and Hartford Accident and Indemnity Company state that the Financial Institution Bond was canceled in accordance with Rider 197 prior to the loss alleged by plaintiff.

24. For further answer, Hartford Casualty Insurance Company and Hartford Accident and Indemnity Company state that the plaintiff failed to comply with Section 5 of the Conditions and Limitations in that it failed to give them notice of the discovery of loss at the earliest practicable moment.[5]

(Pretrial Order ¶ 41; Answer (filing 28).)

48. In the course of discovery to elicit the factual basis for these affirmative defenses, Hartford responded as follows:

INTERROGATORY NO. 3: For each and every Affirmative Defense that you raise in your Answer, state and identify separately for each defense as follows:

a. State the factual basis separately and completely for each Affirmative Defense with citation to the provisions of the Bond upon which you rely.

b. Identify all persons presently with knowledge of any fact to support your defense.

---

[5] Even though the parties have stipulated in the pretrial order that this affirmative defense "relate[s] to TransLand's handling of overdisbursements," the court understands Hartford to be alleging in its answer that TierOne failed to give timely notice of its discovery that TransLand had failed to remit loan payments.

24

RESPONSE:

a. Rider 197 to the Financial Institution Bond provides:

[text of Rider omitted][6]

Various personnel of TierOne Bank discovered by no later than January 2007 that TransLand Financial Services, Inc. had not immediately paid over to TierOne Bank LIP over disbursements. Each failure to pay to TierOne Bank such LIP over disbursements immediately constituted a dishonest or fraudulent act on the part of TransLand Financial Services, Inc. as a Servicing Contractor. In addition, various personnel of TierOne Bank may have discovered that TransLand Financial Services, Inc. had committed dishonest or fraudulent acts in relation to loan debtors.

In addition, Section 5 of the Conditions and Limitations of the Financial Institution Bond, as amended by amended Rider F11, required a Director, Officer, manager, supervisor or any other employee in a managerial position to give notice to Hartford as [sic] the earliest practical moment not to exceed one-hundred twenty (120) days. Section 3 of the Conditions and Limitations of the Financial Institution Bond as amended by Rider F11 provides:

[text of Section 3 omitted][7]

Hartford believes that personnel of Risk Management, General Counsel/Legal, Internal Audit, HR or Corporate Security of TierOne Bank may have discovered a loss more than one-hundred twenty (120) days prior to the time when notice of such loss was given to Hartford.

---

[6] See paragraph 33 above.

[7] See paragraph 34 above.

Hartford reserves the right to supplement its response this Interrogatory upon the completion of discovery.

b. John S. Diaconis, Hartford Financial Products, Hartford Plaza, T-4-101, Hartford, CT 06115. (860) 547-8238.

(Pretrial Order ¶ 42; TierOne's Exhibit 23 (filing 69-6, pp. 175-190).)

49. In responding to discovery in this case, Hartford admitted that TierOne's losses exceeded the Bond's limit.  The question posed to Hartford and its answer are as follows:

INTERROGATORY NO. 4: State the factual basis for your contention that Plaintiff's loss as a result of the failure of TransLand Financial Services, Inc. ("TransLand") to pay to Plaintiff money that TransLand collected on behalf of Plaintiff is an amount of less than $7.6 million.

RESPONSE:

Hartford has not contended that TierOne Bank's loss as a result of the failure of TransLand to pay to Plaintiff money that TransLand collected on behalf of Plaintiff is in an amount of less than $7.6 million.

(Pretrial Order ¶ 43; TierOne's Exhibit 23.)

50.  In responding to Hartford's first set of interrogatories on December 4, 2008, TierOne stated:

Prior to 2007, Tim Higgins communicated his authorization to TransLand to repay LIP overdisbursements within the first few draws following closing. . . . Tim Higgins authorized TransLand to repay LIP overdisbursement through a deduction process that would occur within the first few draws following closing.  Mr. Higgins believes that he provided this authorization near the beginning of TransLand's servicing relationship with TierOne Bank, but he is not certain of the date.

26

In none of the examinations under oath of TierOne employees did anyone identify Tim Higgins as the TierOne employee with whom TransLand had worked out a deal that TransLand would give TierOne the LIP refund at the next draw, nor did any of the TierOne employees who provided examinations under oath state that the authorization allowed TransLand to repay LIP overdisbursements within the first few draws following closing or that Mr. Higgins provided this authorization near the beginning of TransLand's servicing relationship with TierOne. (Pretrial Order ¶¶ 59, 60; Hartford's Statement ¶ 65; Hartford's Exhibit 221 (filing 66-27).)

51. In its responses to Hartford's first set of interrogatories, when asked to "identify any documentary evidence which is relevant to the issues of this action other than those documents you have already produced in connection with the Proof of Loss and Hartford's investigation of the Proof of Loss," TierOne stated:

> Subject to and without waiving its objections, TierOne Bank identifies the following documents:
>
> > A. Two policy and procedure documents concerning the handling of loans serviced [sic] TransLand Financial Services, Inc. ("TransLand"). These documents provide additional proof that TierOne Bank allowed TransLand to refund overdisbursements through the draw process.
> >
> > B. A Suspicious Activity Report filed by TierOne Bank on August 23, 2007.

(Pretrial Order ¶ 61; Hartford's Exhibit 221.)

52. After reviewing numerous additional loan files on January 5 and 6, 2009, which TierOne produced in accordance with its response to Hartford's first request for production, Hartford was able to satisfy itself that Sheryl Brown was correct that TierOne and TransLand must have had an understanding that overdisbursements did not have to be repaid on the first draw because there were so many instances where

that happened and TierOne's records clearly showed that to be the case.  Hartford had access to each of these loans files during Mr. Black's visit to Nebraska in January of 2008, and TierOne offered to allow Hartford to review the files of all 3,393 loan files serviced by Transland during that visit.  ([Pretrial Order](#) ¶ 53, 54; [Hartford's Statement](#) ¶¶ 67, 68 ; [TierOne's Response](#) ¶ 68.)

53.   Paragraph 21 of Hartford's first request for production of documents requested that TierOne produce "[a]ll audits that concern or relate in any way to TransLand Financial Services, Inc. prepared during the period from January 1, 2003, to the present date."  Among the documents that TierOne produced in response to Hartford's request were 150 pages of audit reports concerning TransLand.  ([Pretrial Order](#) ¶ 62.)

54.   Hartford informed TierOne that it had completed its investigation and determined that TierOne's losses were covered by the Bond on February 10, 2009.  This notification occurred three days before the scheduled deposition of the person Hartford had identified as possessing the most information about why Hartford had not paid the claim.  The parties had agreed that the deposition of John S. Diaconis, Hartford's 30(b)(6) representative, would be held on February 13, 2009.  ([Pretrial Order](#) ¶ 55; [TierOne's Statement](#) ¶ 46; [Hartford's Response](#) ¶ 46.)

55. Mr. Diaconis states in an affidavit that:

Hartford determined that the discrepancy between Sheryl Brown's testimony about there having been an understanding or agreement between TierOne Bank and TransLand that TransLand did not have to repay LIP overdisbursements on the first draw and Bennie Wofford's adamant denial that any such understanding or agreement existed was important for two reasons: if Mr. Wofford was correct, it suggested that (1) TierOne Bank was not telling Hartford the truth about its relationship with TransLand, and (2) TierOne Bank might have had prior knowledge of dishonest or fraudulent acts on the part of TransLand, which would have resulted in cancellation of coverage for

TransLand under section 3 of Rider 197, the Servicing Contractors Insuring Agreement.

* * *

Hartford determined that TierOne Bank's claim relating to TransLand required further investigation to try to determine whether or not (1) TierOne Bank had discovered any dishonest or fraudulent act on the part of TransLand, (2) TierOne Bank had complied with its duties to provide timely notice of loss and Proof of Loss, and (3) TierOne Bank had complied with its duties to produce for Hartford's examination all pertinent records and cooperate with Hartford in all matters pertaining to the loss.[8]

(Hartford's Statement ¶¶ 48, 51; Hartford's Exhibit C (filing 66-4) ¶ 25, 32.)

56.    At the completion of its investigation in January 2009, Hartford concluded that the facts did not indicate that TierOne knew of any dishonesty by TransLand prior to August 2007.  (Pretrial Order ¶ 56.)

57.   Hartford transmitted a check in the amount of $7,500,000 for delivery to TierOne on February 16, 2009.   The funds became available to TierOne on February 19, 2009, 470 days after TierOne filed its proof of loss. (Pretrial Order ¶ 57.)

58.   Twelve percent interest on $7,500,000 from November 7, 2007, to February 19, 2009, equals $1,158,904.11.  (Pretrial Order ¶ 58.)

---

[8]TierOne objects that these statements are based on inadmissible hearsay and are irrelevant because Hartford's subjective beliefs during its investigation cannot give rise to a reasonable controversy regarding coverage.  The hearsay objection is overruled with the understanding that the statements are not offered to prove the truth of the matter asserted.  The relevancy objection is also overruled.

*Discussion*

The parties agree that the question of TierOne's entitlement to prejudgment interest is governed by the substantive law of Nebraska. The parties are also in agreement that the applicable Nebraska statute provides in pertinent part that "interest as provided in section 45-104 shall accrue on the unpaid balance of liquidated claims from the date the cause of action arose until the entry of judgment." Neb.Rev.Stat. § 45-103.02(2) (West, WESTLAW through 2008 legislation). Section 45-104 provides, in part: "Unless otherwise agreed, interest shall be allowed at the rate of twelve percent per annum on money due on any instrument in writing, or on settlement of the account from the day the balance shall be agreed upon, on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment." Neb. Rev. Stat. § 45-104 (West, WESTLAW through 2008 legislation).

Prejudgment interest may be awarded only as provided in Neb.Rev.Stat. §45-103.02(2). *Archbold v. Reifenrath*, 744 N.W.2d 701, 709 (Neb. 2008); *Travelers Indemnity Co. v. International Nutrition*, 734 N.W.2d 719, 730 (Neb. 2007); *IBP, Inc. v. Sands,* 563 N.W.2d 353, 359 (Neb. 1997).

In Nebraska, interest accrues on the unpaid balance of any liquidated claim from the date the cause of action arose through the date of judgment only when "no reasonable controversy [exists] as to either plaintiff's right to recover or as to the amount of such recovery." *Lange Indus. v. Hallam Grain Co.,* 244 Neb. 465, 507 N.W.2d 465, 477 (1993); *see also* Neb. Rev. Stat. § 45-103.02(2). The mere contesting of the amount of or right to recovery does not alone create a reasonable controversy. *See A.G.A. Inc. v. First Nat'l Bank*, 239 Neb. 74, 474 N.W.2d 655, 658 (1991); *Wiebe Constr. Co. v. School Dist. of Millard*, 198 Neb. 730, 255 N.W.2d 413, 416-17 (1977). Rather, the challenge asserted must be reasonable. *Id.* This inquiry requires an exercise of

discretion by the district court. *Lackawanna Leather Co. v. Martin & Stewart, Ltd.,* 730 F.2d 1197, 1204 (8th Cir.1984). . . .

The certainty of [the plaintiff's] right to recover requires an evaluation of the merits of [the defendant's] defense. Nebraska case law demonstrates the subjective nature of this inquiry. Pre-judgment interest has been inappropriate in disputes over genuinely ambiguous contractual language, *Lange Indus.,* 507 N.W.2d at 477 (disputing whether a contractor had substantially performed under a contract), areas of unsettled law, *Blue Tee Corp. v. CDI Contractors, Inc.,* 247 Neb. 397, 529 N.W.2d 16, 21 (1995) (disputing whether party was a materialman or a sub-contractor), and in cases where resolution was possible only after the district court exercised its fact-finding discretion. *Daubman v. CBS Real Estate Co.,* 254 Neb. 904, 580 N.W.2d 552, 561 (1998) (withholding pre-judgment interest where an agent's ambiguous conduct was held to violate fiduciary duties). However, where the issue is reasonably clear, even the most spirited opposition has not precluded recovery of pre-judgment interest. *A.G.A. Inc.,* 474 N.W.2d at 658 (holding that a bank had no reasonable argument to avoid liability under a clearly stated escrow agreement). These cases all necessarily required an exercise of judgment.

. . .

In order to recover prejudgment interest the amount sought must also be reasonably certain. A reasonably certain amount may be calculated by the trial court without resort to "opinion and discretion in the factfinding process." *Lange Indus.,* 507 N.W.2d at 477. Examples of such include "promises to pay a fixed sum, claims for money had and received, claims for money paid out, and claims for goods or services to be paid for at an agreed rate." *Lackawanna Leather,* 730 F.2d at 1204 (citing *Abbott v. Abbott,* 188 Neb. 61, 195 N.W.2d 204, 209 (1972)). The evidence must "furnish [ ] data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." *Fletcher [v. Mathew,* 233 Neb. 853, 448 N.W.2d 576 (1989)],* 448 N.W.2d at 583 (quotation omitted). . . .

*Lincoln Benefit Life Co. v. Edwards,* 243 F.3d 457, 462-64 (8th Cir. 2001).

31

Hartford argues that its obligation under the financial institution bond was fully discharged when it paid $7,500,000 to TierOne on February 19, 2009, and that TierOne cannot now seek to recover prejudgment interest on that principal amount. In support of this argument, Hartford cites a similar case, *Bank One, West Virginia, St. Albans, N.A. v. U.S. Fidelity and Guar. Co.*, 869 F.Supp. 426 (S.D.W.Va.1994), *aff'd*, 92 F.3d 1176 (Table), No. 95-2024, 1996 WL 432002 (4th Cir. Aug. 2, 1996), in which a bank brought an action against the surety on its financial institution bond seeking interest for delayed payment of the bank's claim of loss by embezzlement. "The district court held, on the authority of *Bennett v. Federal Coke & Coal Co.*, 74 S.E. 418 (W.Va.1912), that [the bank's] cause of action for interest ceased to exist due to [the bank's] acceptance of payment of the principal debt from [the surety] in the course of executing a partial settlement agreement. In addition, the district court found that [the bank] could not recover interest in any event because recovery of such interest was contrary to the explicit terms of [the bank's] fidelity bond, which specifically excluded 'interest . . . not realized by the insured.'" *Id.*, 1996 WL 432002 at * 1 (internal citation omitted). The district court explained its rationale as follows:

> Because the Court is exercising diversity jurisdiction, the law of West Virginia controls. The Supreme Court of Appeals of West Virginia has already decided the instant issue. *Bennett v. Federal Coal & Coke Co.*, 70 W.Va. 456, 74 S.E. 418 (1912). In *Bennett*, a similar dispute ensued over the payment of interest on the principal debt. *Id.* A settlement was reached on the principal, but the plaintiff argued there was an agreement to resolve the interest question later. *Id.* The court found the reservation of rights made no difference. *Id.* 74 S.E. at 422. The court held that if interest is sought as damages for delay in payment, the cause of action cannot stand alone and does not survive payment of the principal debt. *Id.* In Syllabus Point 4, the court stated:

> > "where the contract does not so specifically provide for payment of interest, but the right thereto is by an implication, interest is considered as damages, and not as forming the basis of the action, and is recoverable only along with the principal sum and as an incident thereto, and if the principal sum is accepted in settlement

32

the right to the damages is lost and no separate subsequent action can be maintained therefor."

*Id.* *Bennett* relied in part upon a United States Supreme Court's decision in which the Court held:

> "Where money is retained by one man against the declared will of another, who is entitled to receive it, and who is thus deprived of its use, the rule of courts, in ordinary cases, is, in suits brought for the recovery of the money, to allow interest as compensation to the creditors for such loss.  Interest in such cases is considered as damages, and does not form the basis of the action, but is an incident to the recovery of the principal debt.  The right of action is the right to compel the payment of the money which is being retained.  When he who has this right commences an action for its enforcement, he at the same time acquires a subordinate right, incident to the relief which he may obtain, to demand and receive interest.  If, however, the principal sum has been paid, so that, as to it, an action brought cannot be maintained, the opportunity to acquire a right to damages is lost."

*Stewart v. Barnes*, 153 U.S. 456, 14 S.Ct. 849, 38 L.Ed. 781 (1894).[9]

The court acknowledged *Bennett* remains controlling law in West Virginia by holding:

> "[t]he instant case is not within the rule laid down in the *Bennett* case for the reason that this action was brought to recover principal and interest, both being then unpaid.  No separate action has been brought.  True, the principal was paid after this suit was commenced, but the facts at the time the action was brought control."

*Morton v. Godfrey L. Cabot, Inc.*, 134 W.Va. 55, 63 S.E.2d 861 (1949).  Moreover, the court explained:

---

[9] This holding in *Stewart* was also quoted with approval by the Nebraska Supreme Court in *Fender v. Waller*, 298 N.W. 349, 351 (Neb. 1941).

33

"[t]he rule of law applicable to these facts seems to be undisputed. Where interest is recoverable, not by virtue of an agreement therefor, but wholly as damages for the retention of the principal debt, acceptance of the payment of the principal in full makes recovery of interest thereafter impossible. Interest in such a case is regarded legally as a mere incident to the principal, and when there remains no principal or part of the principal to be recovered there is nothing to which the interest can be incident."

*Hoffman v. Unger*, 125 W.Va. 501, 24 S.E.2d 911 (1943) (Rose, J., concurring).

West Virginia public policy foreshadows this result because it discourages piecemeal litigation. To allow a plaintiff to bring an action after reaching settlement on the underlying claim would encourage litigation rather than compromise.

Interest sought as damages is not recoverable in this action. The Insuring Agreement specifically excludes "interest . . . not realized by the Insured." Contrary to Plaintiff's contention, there can be no reasonable expectation interest would be contemplated under the terms of this agreement. Absent a contractual agreement to the contrary, an action for interest alone cannot be permitted to stand. By accepting settlement on the principal, even with the reservation of rights clause, the Plaintiff effectively discharged its claim. The same situation was presented in *Bennett* and West Virginia's highest court held that once the principal was paid, there could be no suit for interest.

*Id.*, 869 F.Supp. at 428-29.

TierOne contends that the *Bank One* case is distinguishable from the present action because Hartford did not make payment on the bond until after suit was filed. TierOne notes that the West Virginia Supreme Court made this same distinction in the *Morton* case, which was quoted by the federal district court in *Bank One*. As the dissenting opinion in *Morton* persuasively explains, however, such a distinction is "logically unsound and legally unwarranted":

In the case at bar, as in the *Bennett* case, the contract made no specific provision for the payment of interest and, under the holding in that case, the right to interest arising by implication, the interest claimed by the plaintiff should be considered as damages which can be recovered only with and as incident to the principal sum and when payment of the principal sum is accepted by the claimant the right to recover interest as damages is lost. The majority distinguishes the *Bennett* case from this case on the ground that, in this case, the plaintiff sought to recover both the principal sum and the interest and accepted payment of the principal after the institution of the present action, whereas in the *Bennett* case the plaintiff, after accepting payment of the principal amount, sought to recover the interest in a subsequent separate action. The distinction envisioned by the majority between the two cases, based upon the difference just pointed out, is logically unsound and legally unwarranted. If the acceptance of payment of the principal defeats recovery of interest in instances in which the right to interest is implied and not expressly conferred by contract, as decided by this Court in the *Bennett* case, it follows necessarily that the time of the acceptance of the principal, whether before the institution of an action to recover interest on such principal, or during the pendency of an action to recover both the principal sum and interest on it, is of no consequence or importance whatsoever. As the right to interest was not expressly given by, but was implied from, the contract between the parties to this action, it existed merely as an incident of, and as dependent upon, the principal sum; and when that sum in full was paid to, and accepted by, the plaintiff his right to recover interest ceased to exist and, of course, was unenforceable in any suit or action. For this reason the plaintiff is not entitled to recover interest on the principal amount, which has been satisfied and extinguished by full payment made by the defendant and accepted by the plaintiff.

The view just stated is sustained by the reasoning employed in the *Bennett* case, and is fully supported by decisions directly in point in other jurisdictions. In *Davis v. Harrington*, 160 Mass. 278, 35 N.E. 771, 772, the Supreme Judicial Court of Massachusetts held that a person who, after suit is brought, accepts payment of the principal, exclusive of interest due by way of damages for delay in payment, there being no contract to pay interest, can not afterwards recover, for the reason that

interest allowable by way of damages is a pure incident to the debt, which falls when the debt itself is extinguished. In the opinion the Court, after discussing the facts, uses this language:

> . . .

> 'The payment of the principal sum due, having been accepted by the plaintiff, had the same effect as if it had included the interest, and the judgment must be for the defendant. It makes no difference that the payment was after suit brought. *Warner v. Bacon,* 8 Gray [Mass.], 397-405.'

> . . .

Despite the foregoing authorities, and many more to the same effect that could be cited, the majority opinion disposes of this important issue without discussion by the mere statements that the instant case is not within the rule laid down in the *Bennett* case because this action was brought to recover principal and interest, which were then unpaid; that no separate action has been brought; and that, although the principal was paid after this action was commenced, the facts at the time this action was brought control. No authority is cited in support of the legal effect of the situation described in the foregoing statements or to sustain the clearly erroneous conclusion that because this action was instituted to recover both principal and interest due at the time and because the principal was paid and accepted after this action was commenced, the interest, though allowable only as damages for delay in the payment of the principal, may be collected even though the principal, as to which the interest is a mere incident, has been previously paid and accepted in full. The obvious reason for the absence of citation of authority for the conclusion reached by the majority is that such conclusion is contrary to and without the support of the weight of text book or judicial authority.

*Morton*, 63 S.E.2d at 868-70 (Haymond, J., dissenting) (dissenting opinion filed March 9, 1951). *See also In re John Osborn's Sons & Co.*, 177 F. 184, 185 (2nd Cir. 1910) ("It makes no difference . . . that the payment is made while a suit for both

principal and interest is pending.") (citing *Canfield v. School District*, 19 Conn. 529 (1849); *Davis v. Harrington*, 160 Mass. 278 (1894).).

Regardless, the Nebraska Supreme Court has not always adhered to the rule stated in *Stewart*. In *Murphy v. City of Omaha*, 50 N.W. 265 (Neb. 1891), the plaintiff brought an action against the city to recover the balance due under a contract for the construction of a sewer. Work was fully completed and accepted by the city engineer on October 3, 1888. The city engineer determined that the total value of the work performed by the plaintiff was $28,045.40. When suit was filed on November 6, 1888, the plaintiff was still owed $7,551.50, plus a 5% retainage of $1,402.27 that was payable 6 months after the completion date (*i.e.*, on April 3, 1989). The city paid these amounts to the plaintiff on April 19 and May 7, 1889, respectively. When the lower court dismissed the action, the plaintiff appealed. As framed by the Nebraska Supreme Court, "[t]he only question presented [on appeal was] the liability of the city to pay interest upon demands arising upon contracts which are due." *Id.* at 267. The Court determined that the city was liable for interest under the predecessor statute to §45-104, stating:

> Section 4 [c. 44, Comp. St.,] provides: "On money due on any instrument in writing, or on settlement of the account from the day the balance shall be agreed upon, on money received to the use of another, and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment, interest shall be allowed at the rate of seven per cent. per annum. . . ." This law is general in its terms, and applies to cities as well as natural persons. . . . It is evident that the plaintiff is entitled to interest on the sums named while the money was withheld by the city, and the judgment of the court below is reversed, and judgment will be entered in this court for such interest, the amount thereof to be computed by the clerk."

*Id.* In a later case also involving a contract for the construction of a sewer, *Petersen v. City of Omaha*, 231 N.W. 763 (Neb. 1930), the Nebraska Supreme Court set aside an award of statutory interest for delayed progress payments because the total amount

37

of the contract was unliquidated.  Significantly, the Court did not hold that the contractor was prevented by the *Stewart* rule from suing for interest alone.  The Court instead indicated that the question presented by the case was: "Prior to the payments made, was the city in default within the meaning of the statutes creating a liability for interest and *entering into the contract* for the improvement?"  *Id.* at 764 (emphasis supplied).  This language suggests that the Nebraska Supreme Court considered the prejudgment interest statute to be an integral part of the parties' contract.

"It has long been the law, in both this jurisdiction and elsewhere, that the law of the state is an inherent part of every contract and that every contract is made with reference to and subject to the existing law, and every law affecting the contract is read into and becomes a part thereof." *Haakinson & Beaty Co. v. Inland Ins. Co.*, 344 N.W.2d 454, 458 (Neb. 1984) (citing *Bobbitt v. Order of United Commercial Travelers*, 142 N.W.2d 351 (Neb. 1966); *State v. Hurley*, 270 N.W.2d 915 (Neb. 1978); *State ex rel. Douglas v. Nebraska Mortgage Finance Fund*, 283 N.W.2d 12 (Neb. 1979).).  "Statutes which are in effect at the time a contract is made are as much a part of the contract as if they were set forth therein." *Bauers v. City of Lincoln*, 586 N.W.2d 452, 459 (Neb. 1998) (citing *In re Estate of Peterson*, 381 N.W.2d 109 (Neb. 1986); *Haakinson*).

Other courts have applied this familiar rule of law to avoid the result in *Stewart*.  For example, in *Vandercook v. Mayer*, 17 N.E.2d 542 (Ill.App. 1938), it was held that an action could be brought to recover interest for late payment of the balance due under a land contract where an Illinois statute provided for interest on any "instrument of writing".  The court stated:

> The sole question for decision is whether under the facts as stipulated, plaintiffs as a matter of law are entitled to recover interest at the legal rate from June 2, 1937, the date when under the terms of the contract payment of the balance was due up to August 20, 1937, when payment was in fact made.  Section 2 of the Interest Statute (Ill.State Bar Stats.1937, chap. 74, p. 1885) provides: "Creditors shall be allowed to

38

receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment."

It is the theory of plaintiffs (there being no provision in the contract to the contrary) that plaintiffs not having waived their rights and not being in any way estopped are entitled to recover interest under this section of the statute. On the other hand defendant contends that where (as here) by the terms of the contract no promise to pay interest is made and payment of the principal is offered and accepted after the due date, the payment of the principal extinguishes the right to recover interest. Defendant cites *Stewart v. Barnes*, 153 U.S. 456, 14 S.Ct. 849, 38 L.Ed. 781; *Vider v. City of Chicago*, 164 Ill. 354, 45 N.E. 720; *affirming* 60 Ill.App. 595; *note* 100 A.L.R. 104-114.

The *Vider* Case is not in point. . . . The other cases cited are also inapplicable for the reason that the suits were not based on contractual obligations.

Defendant also contends that interest was not collectible for the reason that it could be allowed only as damages, being merely incidental to the debt and not a part of it. He cites *Bank of the United States v. Moskowitz*, 150 Misc. 629, 268 N.Y.S. 705; *Note* 100 A.L.R. 96; *McDonald v. Holden*, 208 Ill. 128, 70 N.E. 21; *Hoblit v. Bloomington*, 71 Ill.App. 204. These cases are not applicable where (as here) the liability grows out of a direct contractual obligation. 13 *C.J.* 560; *Matthias et al. v. Cook*, 31 Ill. 83; *Illinois Bankers Life Ass'n v. Collins*, 341 Ill. 548, 173 N.E. 465. Nor are the cases applicable where (as here) the contract is one which by express provision of the statute bears interest. *Note* 100 A.L.R. 98; 33 *C.J.* 255; *Girard Trust Co. v. United States,* 270 U.S. 163, 46 S.Ct. 229, 70 L.Ed. 524; *Crane v. Craig*, 230 N.Y. 452, 130 N.E. 609.

> . . . The obligation to pay interest was imposed on defendant by the statute that existed when the contract was made and became a part of it just as much as if it had been incorporated into it.

*Id.,* at 543-44.

Similarly, in *Thomas v. Liberty Nat. Life Ins. Co.*, 368 So.2d 254, 257 (Ala. 1979), the Alabama Supreme Court considered "[w]hether a beneficiary of a life insurance policy, after acceptance of the principal amount, can recover interest on the face amount of the policy from the time proof of death is accepted until the time the claim is paid." The Court held that the claim was not barred as a matter of law because the state's prejudgment interest statute entered into the insurance contract. It explained:

> Section 8-8-8, Ala.Code 1975, provides:
>
> > All contracts, express or implied, for the payment of money, or other thing, or for the performance of any act or duty bear interest from the day such money, or thing, estimating it at its money value, should have been paid, or such act, estimating the compensation therefor in money, performed.
>
> It is well settled that, under this section, interest on the principal due on an insurance policy is properly payable from the date that proof of death was accepted by the insurer.
>
> Appellee does not dispute that interest is generally owed from the time proof of death is submitted. Appellee argues, however, that, where interest is provided for otherwise than under contract, it does not constitute a distinct claim recoverable after the acceptance of the principal.
>
> . . .

40

In *Aetna Life Insurance Co. v. Wade*, 210 Ala. 170, 97 So. 636 (1923), in construing s 8-8-8, Ala.Code 1975 (then s 4620, Alabama Code of 1907), this Court stated:

> "The law existing at the time of the issuance of this policy entered into and became a part of the contract, and under the provisions of the foregoing statute we think interest was demandable from the time the policy was due and payable By virtue of the contract entered into." (Emphasis added.)

It is apparent that s 8-8-8, Ala.Code 1975, became a part of the insurance contract and, therefore, became a contractual right. The law is settled that if interest is provided for by contract, a separate action for interest may be maintained even after acceptance of the principal amount. *Semmes Nursery, Inc. v. McDade*, 288 Ala. 523, 263 So.2d 127 (1972); *Alabama City, G. & A. Ry. Co. v. City of Gadsden*, 185 Ala. 263, 64 So. 91 (1913).

Admittedly, this State has a long line of cases distinguishing statutory interest from contractual interest. These cases are in line with the general rule regarding the collectability of interest. At *47 C.J.S., Interest*, s 71, it is stated:

> "Where interest is provided for by contract and is due and payable, it constitutes a specific claim for which an independent action may be brought . . . On the other hand, where interest is recoverable otherwise than under contract, it does not constitute a distinct claim and can only be recovered with the principal by action."

We have carefully considered these cases and disagree with the reasoning that allows the collection of interest after the acceptance of principal when the right to interest is expressed in the contract, but not when the right to interest is mandated by statute. We have searched in vain and find no basis for the distinction, especially in the light of our cases which would read the statute into the contract, making it a part of the agreement.

41

. . .

　　　If we were to rule that interest could not be collected under the circumstances as alleged by Appellant in this case, we would effectively allow insurers to escape from a statutorily imposed obligation, without any remedy for Appellant, short of returning the check for the payment of the principal amount and filing a suit seeking to regain this principal along with the small amount of interest owed for the short period from the filing of proof of loss until the tender of the face amount of the policy.  It is unreasonable to expect a beneficiary or an insured to take such costly and time-consuming measures, that is, to forego immediate acceptance of the principal amount in order to pursue at his own expense his remedy for the relatively small additional amount of interest.

*Id.*, at 257-59 (citations omitted).

　　　In *United States v. Consolidated Edison Co. of New York, Inc.*, 590 F.Supp. 266 (D.C.N.Y. 1984), involving an action to recover interest on overcharges for electric service, the court held that the *Stewart* rule does not apply to an action for breach of contract where a statute provides for prejudgment interest:

　　　In *Stewart*, where plaintiff sought to recover interest on taxes wrongfully withheld from him, there was no statutory provision allowing the recovery of interest in such situations.  The Supreme Court later indicated, in *Girard Trust Co. v. United States*, [270 U.S. 163 (1926)], that *Stewart* does not apply when the payment of interest is mandated or allowed by statute:

　　　　　[In *Stewart*] [t]his Court held that the taxpayer could not maintain an independent action for interest, for the reason that in such cases interest is considered as damages, does not form the basis of the action, and is only an incident to the recovery of the principal debt.  We do not think that it controls this case.  The payment of interest in the *Stewart* Case was not expressly provided for in the Act.  In this case there is statutory provision for it, and it is analogous to a suit in debt or covenant in which the

contract specifically provides for payment of interest on the principal debt. In such cases the authorities all hold that the acceptance of the payment of the principal debt does not preclude a further suit for the interest unpaid. And the same rule obtains where the obligation is one that by statute bears interest.

[*Id.*, at 168.]

There is no question that had plaintiff sued to recover its overpayment, it would have been entitled to interest upon the overpayment, because New York provides by statute for the recovery of interest "upon a sum awarded because of a breach of performance of a contract." There was no statute or regulation in New York at the time plaintiff was overbilled directly analogous to the statute in *Girard*, which required the Internal Revenue Commission to pay interest upon refunds or credits of taxes overpaid. However, the statutory provision for interest upon damages awarded for a breach of contract brings this case closer to the *Girard Trust* rule than to *Stewart*.

*Id.*, at 269-70 (footnotes omitted). *See also In re Hoffman*, 712 N.Y.S.2d 165, 166 (N.Y.A.D. 2000) ("Since the petitioner's claim against the respondents is essentially in the nature of breach of contract, she has a statutory right to an award of interest pursuant to CPLR 5001(a) . . .. Moreover, the respondents' tender of payment after the commencement of litigation did not defeat the petitioner's statutory rights under CPLR 5001 because she accepted the tender without prejudice to her claim for interest . . .."); *Charles R. Shepherd, Inc. v. United States ex rel. Sullivan, Long & Hagerty, Inc.,* 292 F.2d 146, 147 (5th Cir. 1961) ("No case cited by [the defendant] holds that a claim for interest based on a statute, which claim has not been clearly waived, is extinguished by the acceptance of payment of the principal amount. In such a case, there is no conceptual difficulty in saying that the debt for interest exists independently of the principal obligation.").

"Prejudgment interest is interest due, pursuant to statute, prior to the rendition of a judgment. In the case of a written instrument, it is allowed on liquidated claims

43

pursuant to the provisions of Neb.Rev.Stat. § 45-104[.]"  *First Nat. Bank in Mitchell v. Bolzer*, 377 N.W.2d 533, 537 (Neb. 1985).  For the reasons explained above, if TierOne can establish that its bond claim was liquidated – that is, there was no reasonable controversy either as to its right to recover under the bond or as to the amount of such recovery – then Hartford's eventual payment of the claim will not defeat the statutory allowance of 12% interest.

Hartford contends, however, that recovery of prejudgment interest is excluded by Section 2(s) of the bond, which provides that the bond does not cover "potential income, including but not limited to interest and dividends, not realized by the Insured[.]"  This same argument was advanced by the surety in *Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co. of Maryland*, 744 F.Supp. 1311 (D.N.J. 1990), and was properly rejected by the court, as follows:

> Fidelity argues that prejudgment interest cannot be awarded, because an award of interest is excluded from coverage under Section 2(t) of the bond.  This section excludes coverage for "potential income, including but not limited to interest and dividends, not realized by the Insured."  Oritani concedes that it is limited in its recovery to out-of-pocket damages.  However, it argues that the cited exclusion has no relevance in a case such as this, involving breach of the insurance contract, because the exclusion merely defines what is included in a "loss" for the purpose of determining what amount of coverage should be timely paid.. . .

> I find that the distinction made by Oritani is reasonable.  There is a difference between the interest that accrues, or could have been earned, between the time that a loss is suffered and a claim is paid, and the interest that accrues between the time that a claim is wrongfully denied and recovery is had under the contract.   In addition, the "exclusions section" of the blanket bond, relied upon by Fidelity to limit its liability for prejudgment interest, begins with the phrase "This bond does not cover . . .."  Hence, it is reasonable to interpret the purpose of the exclusionary section as limiting the bounds of insurance coverage as opposed to limiting the insurer's liability in the event of a lawsuit.

44

*Id.*, at 1318-19 (citations and footnotes omitted).  *But see Bank One*, 869 F.Supp. at 429 (stating there could be no reasonable expectation prejudgment interest would be contemplated under the terms of a bond which excluded coverage for "interest . . . not realized by the Insured.").  Hartford also contends that an award of prejudgment interest would be contrary to Section 2(v) of the bond, which excludes coverage for "indirect or consequential loss of any nature," but this is not a reasonable interpretation of the exclusion.

An additional reason for concluding that TierOne's acceptance of payment under the bond did not prejudice its claim for prejudgment interest is that fact that TierOne's attorney sent an e-mail to one of Hartford's attorneys, Keith Witten, on February 13, 2009, requesting confirmation "that the defendants are tendering the check for $7,500,000 without conditions and that the defendants agree that the check may be negotiated by TierOne without prejudice to the claims asserted by plaintiff in the above-captioned lawsuit."  (TierOne's Exhibit 26 (filing 69-6, p. 197).) Mr. Witten replied by e-mail that same date, stating: "As I stated in my letter to you earlier today, the $7,500,000 check is tendered without conditions.[10] Thus, the check is tendered without conditions in regard to the claims for attorneys fees and interest asserted by TierOne in the above-captioned lawsuit, and may be negotiated as such." (TierOne's Exhibit 26.)  While Mr. Witten did not expressly confirm that there was an agreement the check could be negotiated without prejudicing TierOne's claim for prejudgment interest, neither did he deny the existence of such an agreement.  "[A] well-established exception to [the *Stewart*] rule is where the parties agree that acceptance of the principal will not constitute a bar to a suit for interest." *Ring Const. Corp. v. United States*, 209 F.2d 668, 671 (8th Cir. 1954) (in action bought by United States against contractor for interest on excessive profits from war contracts, where parties had stipulated when principal was paid that question of interest remained to be determined, Eighth Circuit found that "the parties at all times intended to reserve

---

[10] The letter is not in evidence.

to the government the right to collect interest notwithstanding the payment of the principal amount due.").

Having determined that TierOne's claim for prejudgment remains actionable, the next question to be answered is when the claim arose. TierOne contends that it is entitled to interest from November 7, 2007, when it submitted the proof of loss to Hartford. This position is consistent with the Nebraska Supreme Court's holding in *Blue Valley Co-op. v. National Farmers Organization*, 600 N.W.2d 786, 796 (Neb. 1999), that prejudgment interest began accruing on a liquidated claim on the date when the plaintiff demanded such compensation from the defendant. However, under the terms of Section 5 the financial institution bond, the proof of loss was required to be "duly sworn to, with full particulars[,]" and TierOne was not permitted to commence a legal proceeding to collect on the bond "prior to the expiration of 60 days after the original proof of loss is filed[.]" (Pretrial Order ¶ 64; Hartford's Exhibit 202.) Comparable bond language was considered in *Regis Ins.Co. v. Fidelity & Deposit Co. of Maryland*, No. 90-6674, 1992 WL 142022, at *5-7 (E.D.Pa. June 17, 1992), *aff'd*, 989 F.2d 488 (Table), No. 92-1590, 1993 WL 69127 (3rd Cir. Feb. 24, 1993), and was held to mean that prejudgment interest does not begin to run until 60 days after the "full particulars" of the loss have been provided to the bond company:

> Plaintiffs and the defendant agree that interest begins to accrue when performance is regarded as due, and at which time nonpayment becomes actionable. *See e.g. Benefit Trust Life Insurance Co. v. Union National Bank of Pittsburgh*, 776 F.2d 1174, 1178 (3d Cir.1985). The dispute, however, centers over when the proceeds of the F & D bond became payable. Plaintiffs contend that it became payable on May 22, 1989 – sixty days after F & D received plaintiffs' proof of loss, and the date the insured could pursue legal proceedings against the bond company. . . . Defendant counters that it was not obligated to pay until after it received, in the bond's language, a proof of loss with "full particulars."

46

Although F & D concedes that on March 22, 1989, it received the document titled "proof of loss", with attached copies of the checks claimed by plaintiffs to be evidence of allegedly unauthorized withdrawals of company funds, it nevertheless contends that it did not receive documentation, the full particulars supporting the claim, until much later. F & D argues that the prejudgment interest should run, not from the 60 days after the proof of loss was submitted, but some seventeen months later, on October 19, 1990, when F & D formally denied the plaintiffs' claim.

My research has disclosed no Third Circuit case directly facing the issue. However, the Eighth Circuit, in *American Insurance Co. v. First National Bank in St. Louis,* 409 F.2d 1387 (8th Cir.1969), held that the prejudgment interest commences at the end of the bond's sixty-day moratorium, expressly rejecting an argument F & D advances here – that interest can only run from the date defendant denied the claim and breached its obligation to pay under its bond. *Id.* at 1391. Similarly, in *Clarendon Bank & Trust v. Fidelity & Deposit Co. of Md.*, 406 F.Supp. 1161, 1174 (E.D.Va.1975), the court held that prejudgment interest commenced at the end of the sixty-day moratorium. There, the court was construing a bond with language identical to that at bar, issued by the same defendant – F & D. *See also M.B.A.F.B. Federal Credit Union v. Cumis Ins. Soc., Inc.*, 507 F.Supp. 794 (D.S.C.1981).

I agree with the court's reading of the F & D bond in *Clarendon Bank & Trust v. Fidelity & Deposit Co. of Md.*, *supra*; I conclude that F & D's obligation to pay on the bond only comes when legal proceedings can be instituted, sixty days after it received a proof of loss with full particulars. That would be the date from which prejudgment interest would then be calculated as well. That way, plaintiffs who sought to work with the bond company, instead of filing suit forthwith, would not be punished by being deprived of interest accruing while they were trying to work out their differences with the bond company. The argument does have some commonsense and equitable appeal.

I do not hold, however, as plaintiffs request, that prejudgment interest must always start sixty days after the submission of a document – any document – called "proof of loss." Plaintiffs claim that if the

47

court does not set down this bright-line rule, bond companies could just keep requesting more and more documentation. They could string plaintiffs along until the bond company finally denies the claim many months or years later, thereby precluding its insured from collecting interest on the months that the company had waited before it wrongfully denied the claim. A bright-line rule, plaintiffs claim, would encourage bond companies to deny the claim early on the basis of inadequate documentation. Were there to have been such delaying tactics here, they would not be countenanced. But plaintiffs' example of hypothetical bad-faith footdragging remains that – hypothetical.

F & D points out, however, that since the proof of loss submitted by plaintiffs contained but a one-sentence description of the claim, merely stating that funds were withdrawn without proper authorization, and enclosing copies of certain checks, F & D was within its rights in finding that proof of loss to be inadequate and thus, not activating its obligation to pay. *See Abilene Savings Ass'n v. Westchester Fire Ins. Co.*, 461 F.2d 557, 559 (5th Cir.1972) (applying Texas law). While F & D did not declare plaintiffs' proof of loss deficient or inadequate, in so many words, its lawyer did communicate with plaintiffs' attorney asking for more information. . . .

. . .

In this case, I must reasonably construe the contractual language "affirmative proof of loss with full particulars" to effectuate the intent of the parties. *See Unit Vending Corp. v. Lacas*, 410 Pa. 614, 190 A.2d 298 (1963). I read "full particulars" to mean reasonably full particulars. Not every empirical morsel of evidence need be tendered, but there should be enough full particularity for the bond company to make a reasonably informed decision. Should it wish to dig further, going beyond those reasonably full particulars, before tendering the quarter million dollars, it may do so. But once those "full particulars" have, within reason, been presented, the monetary meter runs against it and not against the plaintiffs.

48

In the present case, Hartford has denied that TierOne provided it with all necessary information prior to filing suit,[11] but it appears from the available evidence that the proof of claim was reasonably complete when it was filed on November 7, 2007.[12]  During the succeeding 60-day period, which ended on January 6, 2008, no additional information was requested by Hartford; Mr. Black and Mr. Paskert only asked to  meet with those TierOne employees who were most familiar with the proof of loss and the accompanying materials.  This meeting was held on December 22, 2007.  When Hartford did request additional information on January 7, 2008, it was provided the following week; on January 14-17, 2008, Mr. Black reviewed documents at TierOne's offices and had access to all 3,393 loan files involving TransLand.

Some additional information was provided (1) on February 27 and 28, 2008, when six TierOne employees were examined under oath, (2) on March 25, 2008, when interest calculations and loan payoff information were forwarded by Mr. Reuter, although Mr. Black denies ever receiving this information, (3) on July 18, 2008, when TierOne provided several documents in response to an invitation from Hartford, and (4) on December 4, 2008, when TierOne responded to Hartford's interrogatories and requests for production of documents.  Hartford has not shown, however, that any of this additional information was essential to its determination on February 10, 2009, that TierOne's loss was covered by the bond.

---

[11] Hartford also argues in its brief that it was concerned that TierOne had not complied with its duties under Section 7 of the bond to produce all pertinent records and to cooperate in Hartford's investigation, but this affirmative defense was not alleged in the pleadings.  Even if the defense had been pleaded, there is no evidence to support it.

[12] Hartford had also requested claim documentation on August 17, 2007, which TierOne promptly supplied on August 29, 2007.

"[T]he concern that was uppermost in the mind of Hartford . . . [was] whether coverage had been cancelled under Section 3 of the Servicing Contractors Insuring Agreement [Rider 197]." (Hartford's Brief in Opposition (filing 81), p. 12.)  The question arose after Mr. Black reviewed documents at TierOne's offices in January 2008 and found the series of e-mails regarding the overdisbursement issue.  He questioned Ms. Brown about the overdisbursements in February 2008 and was told that another manager at TierOne had previously approved Transland's retention of the funds.  It is undisputed that Hartford was able to satisfy itself after reviewing numerous loan files in January 2009 that Sheryl Brown was telling the truth, because there were so many instances where overdisbursements were not repaid immediately and TierOne's records clearly showed that to be the case.  It is also undisputed, however, that all of these loan files had been made available to Hartford a year earlier.

Hartford complains that TierOne waited until answering interrogatories to identify Tim Higgins as the manager who had authorized TransLand to repay the LIP overdisbursements on a delayed basis, but it does not appear that Hartford previously requested this information.  Mr. Higgins was examined under oath in February 2008, along with five other TierOne employees, but Sheryl Brown was the only one who was questioned about the overdisbursements.  Hartford also notes that in the answers to interrogatories TierOne identified two policy and procedure documents that allegedly provided additional proof that TransLand was allowed to refund overdisbursements through the draw process, but Hartford has not shown that the documents were at all significant.  Similarly, the evidence shows that TierOne first identified and produced certain audit reports in December 2008 and January 2009 when responding to Hartford's discovery requests, but there is no indication that these reports contain any useful information.  The reports concern quality control audits in which randomly selected loan files were examined for completeness; the audits were not confined to loans that originated with TransLand, nor does it appear that any financial records were examined.  The reports merely list paperwork that was missing from TierOne's loan files.

It is understandable that the overdisbursement issue raised a "red flag" with Hartford, but there is no evidence of any fraudulent or dishonest activity in this connection. Although TierOne notified TransLand in April 2007 that it would be declared in default unless the overdisbursements were fully refunded within 30 days, the payment was promptly made and TierOne suffered no loss.

TierOne and TransLand subsequently negotiated a termination of their loan servicing agreement, which was concluded on August 2, 2007.[13] The $12 million loss was discovered 5 days later when TransLand provided TierOne with computer records showing that 60 loans for which TransLand had been remitting monthly payments were no longer being serviced. Hartford has pointed to no evidence which suggests that TierOne had any prior knowledge of the loss, nor has it been shown that any material information was withheld. There is a genuine dispute whether TierOne provided Hartford with interest calculations and loan payoff information in March 2008, but the dispute is not material because Hartford has failed to show that the information was necessary to a determination that the amount of TierOne's loss exceeded the bond limit. Also, while TierOne provided additional documentation in support of its claim in July 2008, this documentation is not in evidence and Hartford indicated at the time that it previously seen most, if not all, of the materials.

In summary, regardless of whether it was prudent from a business standpoint for Hartford to delay paying TierOne's claim, there was no objectively reasonable controversy either as to TierOne's right to recover under the bond or as to the amount of such recovery. "The parties agree . . . that defendants' state of mind is not relevant to this issue" of whether the claim was liquidated. (Pretrial Order, p. 22.) TierOne

---

[13] Recitations in the agreement concerning allegations of fraud and acts of wrongdoing that were made against TransLand by borrowers in various lawsuits are immaterial to the issues of whether the bond was cancelled under Section 3 of Rider 197 or whether TierOne gave timely notice of loss under Section 5 of the Conditions and Limitations of the Bond.

therefore is entitled to prejudgment interest from the date its cause of action arose on the bond, which was 60 days after the filing of its proof of loss on November 7, 2007. The interest continued to run until the $7,500,000 payment was received by TierOne on February 19, 2009, a period of 410 days. Calculated at a simple rate of 12 percent per annum, the total amount of prejudgment interest to be awarded is $1,010,958.90.

TierOne also claims that it is entitled to an award of attorney's fees under Neb. Rev. Stat. § 44-359 (West, WESTLAW through 2008 legislation), which provides in relevant part:

> In all cases when the beneficiary or other person entitled thereto brings an action upon any type of insurance policy . . . against any company, person, or association doing business in this state, the court, upon rendering judgment against such company, person, or association, shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his or her recovery, to be taxed as part of the costs.

The question of TierOne's entitlement to an award under this section has not been adequately briefed, and, in any event, "[a] claim for attorney's fees . . . must be made by motion unless the substantive law requires these fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2)(A). TierOne will be allowed additional time to file and serve a motion for attorney's fees in the manner provided by Federal Rule of Civil Procedure 54 and Nebraska Civil Rule 54.3. The court will not enter judgment on the award of prejudgment interest until the issue of attorney's fee has been resolved.

Accordingly,

IT IS ORDERED that:

1. The defendants' motion for summary judgment (filing 64) is denied.

2.      The plaintiff's motion for summary judgment (filing 67) is granted in part and denied in part, as follows:

      a.      The plaintiff shall recover from the defendants as prejudgment interest the sum of $1,010,958.90.

      b.      In all other respects the motion is denied.

3.      The plaintiff shall have until September 10, 2009, to file and serve a motion for attorney's fees with supporting brief and affidavit[s].

4.      The defendants shall have until September 28, 2009, to respond to such motion.

5.      The plaintiff may reply on or before October 8, 2009.

6.      Entry of judgment shall be postponed pending disposition of such motion, which will be ripe for decision on October 9, 2009.

August 24, 2009.                          BY THE COURT:

                                              *Richard G. Kopf*

                                    United States District Judge

---

      *This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.